MEMPHIS & C. PACKET CO. v. OVERMAN CARRIAGE CO. et al.

(Circuit Court, S. D. Ohio, W. D.    March 9, 1899.)

No. 1,754.

1. SHIPPING—COLLISION OF STEAMER WITH BRIDGE PIER—UNSEAWORTHINESS.
    A court cannot find that the sinking of a steamer by collision with the pier of a bridge was due to unseaworthiness, merely from doubtful inferences, where there is direct and positive evidence of other facts which would alone account for the disaster.

2. SAME—NEGLIGENCE OF OFFICERS IN NAVIGATION OF VESSEL.
    The Longfellow, a large river steamer, was starting on a trip from Cincinnati to New Orleans, carrying passengers and a valuable cargo. She had pilots on board, and was assisted by a tug. While the smokestacks were lowered to permit her passage under the suspension bridge at Cincinnati, as was frequently the case, the pilot house became so filled with

smoke that the pilot could not see to navigate the vessel past the railroad bridge below, but she continued at full speed; and, her side striking one of the piers, she was broken in two by the current and sunk,—some of her passengers being drowned, and her cargo lost. The river was high and the current strong. No effort to stop the vessel was made until too late to avoid the collision. No arrangement appeared to have been made with the tug to secure efficient aid in the management and handling of the vessel. *Held*, under the facts shown, that the disaster was due to negligence of the officers and pilots, in failing to make such arrangements, and in not stopping and backing at once when the smoke so obscured their vision as to make the attempt to pass the lower bridge at that time unsafe.

3. SAME—LIABILITY OF OWNERS—RIGHT OF LIMITATION.

Where the owners of a steamer started her on a voyage on a clear morning in a seaworthy condition, properly manned and equipped, and furnished with licensed and experienced master and pilots, and the assistance of a tug, the negligence of her officers and pilots in permitting her to come in collision with a bridge pier must be held to have been without the priority or knowledge of the owners, so as to entitle them to a limitation of their liability for damages resulting from such collision to passengers and cargo.

4. SAME—ELECTION OF MASTER TO CONTINUE VOYAGE.

A hasty exchange of opinions between a pilot and master of a river steamer, in the face of immediate danger, as to the best means of avoiding such danger, though the pilot advises the stopping of the vessel, which is not done, does not constitute a deliberate election by the master to continue the voyage against the advice of the pilot, within the meaning of Rev. St. § 4487, so as to render the owners absolutely liable for damages thereafter arising to the persons or baggage of passengers, and especially where it was at the time too late to avoid the injury which resulted.

This was a libel filed by the Memphis & Cincinnati Packet Company, owner of the steamer Longfellow, to obtain exemption from, or limitation of, liability for damages to passengers and cargo resulting from the sinking of the vessel through a collision with the pier of a bridge.

Johnson & Levi and W. H. Jones, for libelant.

Oscar M. Gottschall, Joseph Wilby, Thomas McDougall, Alfred C. Cassett, and Scott Bonham, for respondents.

THOMPSON, District Judge. About half past 6 o'clock on the morning of the 8th of March, 1895, the steamboat Longfellow, owned by the libelant, left the port at Cincinnati, Ohio, on a voyage to the port of New Orleans, La., and return. There was no fog. The morning was clear. The chimneys were lowered to enable the boat to pass under the bridges which cross the Ohio river at the port of Cincinnati, and extended horizontally aft. As she was passing under the Suspension bridge, the smoke from the chimneys filled the pilot house, and hid from the pilot's view the piers of the next bridge below,—the Chesapeake & Ohio Railroad bridge,—so that he was not able to observe and direct the course of the boat, safely, between the piers. The river being at flood stage, and the boat under full headway, she soon ran upon one of the piers of the railroad bridge; striking the pier with her starboard side, near the boilers, with such force as to cause her to career upon her side, break in two, sink, and become a total wreck,—causing thereby the death of a number of persons, and the loss of her cargo. On the 23d of May, 1895, this

libel was filed against the respondents named therein, and all others who might intervene, setting forth the loss of the boat and its cargo, and the loss of life caused thereby, and alleging that the boat, when she started on the voyage, was "staunch and seaworthy, fully equipped with all the necessary machinery, tackle, and appliances" required by law, and "manned by a full corps of efficient and duly-licensed pilots, engineers, etc., and in charge of a competent and duly-licensed master," and that the disaster occurred "without any fault or negligence" on the part of the libelant, "or of any of the officers or crew" of the boat, and without the privity or knowledge of the libelant, and further alleging that the libel was filed for the purpose of contesting all claims of the respondents and interveners for losses and damages arising from the sinking and destruction of the boat. The libelant prays that if, upon final hearing, it be determined that libelant is not liable for the loss and damages occasioned by the disaster, it be so decreed, or if it be found that the libelant is liable therefor, in a sum greater than the value of the vessel and her freight pending at the time of the disaster, then that it be decreed that the libelant be discharged from all other and further liability upon payment of the value of the boat and her freight into court, and that meantime the respondents and all interveners be enjoined from prosecuting suits against libelant for said losses and damages. To this libel John J. Clayton, as administrator of the estate of Mary Elizabeth Aull, deceased, who lost her life by the sinking of the boat, intervening, files an answer and cross libel, and denies that said boat, on the 8th day of March, 1895, was staunch and seaworthy, or fully equipped, or in charge of a competent master, or that the libelant is entitled to exemption from, or to limitation of liability for, damages for causing the death of Mary Elizabeth Aull, and by way of cross libel alleges that said vessel was sunk, and the death of Mary Elizabeth Aull was caused, by the failure of the officers of the boat to comply with title 52 of the Revised Statutes of the United States, by their failure to warn the passengers of the boat of the danger they were in, by the refusal of the master to stop the boat, although admonished by the pilot that by reason of the smoke further navigation was unsafe, and by reason of gross negligence in the navigation of the vessel, and therefore the libelant is not entitled to exemption from liability for the death of the said Mary Elizabeth Aull, nor to have such liability limited to the value of the boat and its pending freight; that the disaster occurred within the boundaries of the state of Kentucky; and that under the statutes of Kentucky the cross libelant is entitled to recover damages for the wrongful act of the libelant in causing the death of Mary Elizabeth Aull, and that the amount claimed is $20,000. Other cross libels have been filed by the representatives of the other persons who lost their lives, and many answers and cross libels have been filed, setting up claims for the loss of baggage, goods, etc. Issue is joined upon these answers and cross libels by reply. It is claimed by the respondents and interveners that the boat was lost by reason of negligence of the officers, and her unseaworthiness, and the questions presented are: (1) Was the destruction of the boat, and the consequent loss of life and property, due to negligence and unsea-

worthiness? (2) If so, was such negligence and unseaworthiness without the privity or knowledge of the libelant?

First, was the destruction of the boat due to negligence and unseaworthiness? If not, then libelant is not liable to answer in damages to any of the respondents; but, if it was, then it is liable in the amounts found by the master, unless it appear that the losses and injuries complained of were without the privity or knowledge of the libelant, in which case the liability would be limited to the value of the vessel and the freight pending at the time of the disaster.

Was she seaworthy? It is said that she was an old boat lengthened by cutting her in two and adding 30 feet in the center, making her about 300 feet long, and leaving her structurally weak; that she was unwieldy, and slow in answering her helm; that she was rotten, because the pier cut into her without a jar; that she had been injured a month before by colliding with the same pier on which she sunk; that she was injured by grounding near Paducah, Ky., a few days before she sunk; that she was unruly in backing; that she was overloaded; and therefore for these reasons was not seaworthy. On the other hand, there is evidence that the injuries which she received were slight, and had been repaired, and that she was staunch and seaworthy. Upon all the evidence, I would not be inclined to find that she was unseaworthy; but, in the view I take of the case, it is not necessary to nicely weigh the evidence in order to determine whether she was up to the mark in all points of seaworthiness. As I see the case, it is not shown that the disaster was due to unseaworthiness. No witness states that she was unseaworthy. No witness states that the disaster was due to unseaworthiness. No one offers an opinion or draws an inference upon any knowledge of her, or of her action at the time of the disaster to that effect, except the witness Wood, who expresses the opinion that she was rotten, because the pier seemed to crash into her without a jar. That, however, may have been due to the manner in which she struck the pier. But let that be as it may; the weight of the evidence is opposed to the opinion expressed by Mr. Wood. The suddenness of the destruction of the boat may be accounted for by the great force with which she struck the pier, and the pressure of the current on the ends, which broke her in two, and carried the parts on either side of the pier. The water was high, the current rapid, and she was under a full head of steam; and, as Capt. McKay says, the current caught her on the port guard, and tripped her up, and gradually rolled her over. Counsel, in argument, ask the court to draw inferences of unseaworthiness upon facts which may or may not justify them, and then found upon these inferences a finding that the collision and its consequences were due to unseaworthiness. But such a finding ought not to be based upon doubtful inferences. If overloading rendered her unmanageable, and forced her upon the pier, that could have been shown. If she was unruly in backing, and slow in answering her helm, and in consequence thereof the officers and crew were unable to prevent her from running upon the pier, that could have been shown. If she was weak and rotten, so that she went to pieces, causing a loss of life and property, which would

not have followed had she been staunch and strong, that could have been shown, and not left to conjecture and inference.

After the disaster, in preparing to prosecute claims, it was learned that she was an old boat; that she had been lengthened; that sometimes she did not answer to her helm as she should; that she was slow in backing; and these facts are now brought to the attention of the court, and the court is asked to infer a condition of unseaworthiness which caused this disaster. Now, in the face of positive testimony as to seaworthiness, and in view of the evidence which shows what it was that caused her destruction, the court cannot, upon mere inference, say, not only that she was unseaworthy, but that that condition caused the disaster. Was it due, then, to negligence in the navigation of the boat? As I have said, the water was high, the current rapid; the passage under the railroad bridge was known to be dangerous; the boat had many passengers, and a large cargo of valuable property; and a high degree of care—a degree of care proportionate to the danger—was required of the master and the pilots in making the passage, in order to secure the safety of the boat, its passengers, and cargo. Did they exercise the care required? I think not. I do not think any arrangement was made with the towboat to insure efficient aid in the management and handling of the boat, and I think it was negligence on the part of the master and pilot not to stop and back up the moment the smoke obscured their vision. Had there been proper co-operation between the master of the towboat and the master of the Longfellow, and had they united in an effort to stop and back her as soon as the smoke obscured their view, the collision, in my opinion, could have been prevented. The situation required that they should do so; but, instead, they allowed the boat to run at full speed in the darkness caused by the smoke until they found they were about to strike the pier. Then they became panic-stricken, and threw away the still possible chance of escape. Any one who will read (and I will not take the time to do it) the testimony of those who had an opportunity to see and know just how this disaster occurred will at once be convinced that there was a condition of panic there, in which they lost their heads, and failed to do the things that ought to have been done, looking to the safety of the boat and its passengers and cargo. The witnesses Wood, Mrs. Wood, Miss Dalrymple, McKay, Whitten, Trunnel, and Williams agree that when near the Suspension bridge the smoke obscured the view, and that a short time afterwards it was apparent that the boat would strike the pier of the railroad bridge, and that she did strike it, and became a total wreck; but, as to everything else they are in confusion. Wood, his wife, and Miss Myrtle Dalrymple, who were in the pilot house, say that the pilot called to the captain, "Captain, captain, I can't see anything, for this smoke; stop her, stop her;" and again, later, "Stop her; I can't see anything, for this smoke;" and the captain answered both times, "Go ahead; you are all right; go south of the pier." But Capt. McKay, who was a lake captain of long experience (he had spent 34 years in the navigation of the Great Lakes), who also was

in the pilot house, and had the same opportunity of observing what was going on and of hearing what was said, says:

"I think we were about a thousand feet from this abutment [meaning the pier]. About that time some one on the deck hallooed, 'Take the Kentucky side.' And just about this time this pilot that was not on duty, he says, speaking to the pilot at the wheel, 'Then why in hell don't you do it?'"

He did not hear the pilot call to. the captain, "Stop her; I can't see, for the smoke;" but, he heard the direction, "Take the Kentucky side;" and that was the course the boat was then taking, and an attempt was made to run to the Kentucky side of the pier.

Capt. Kirker says:

"I says to the pilot— I ran back, and just at that time the mate came up, and I was speaking to him; and as I turned away from him I seen the pier. I hallooed to the pilot: 'You are off the pier. You are headed to the pier. Stop her and back her. Stop her and back her,'—which he did."

Then Whitten, the pilot, says:

"Then I hollered the second time, and the answer came, 'You are pointed down to the left of the pier.' I says, "My Lord! I had better get there, then;" and I tried to get into the Kentucky shore as close as I could get there,—to get in to the left of the pier. Somebody hollered to stop her and to back her. That was 120 or 200 yards out, under pretty good headway,—a good current. She wouldn't stop. I hollered that she was sinking before she hit the pier. I knowed that she was." '

Then he says, on cross-examination, referring to the captain:

"He hollered that I was pointed to the left of the pier. Then I hollered that I had better get there, and I tried to get there. Then I stopped, and commenced backing her."

And he says, when recalled:

"Q. Whether you ordered or asked Captain Kirker, or told Captain Kirker, to stop the boat. A. No, sir; I didn't ask Captain Kirker to stop the boat. Q. I will ask you whether you gave any order of that kind to any other person. A. I hollered to Captain Williams to stop his boat and to back her."

Now, Williams, the captain of the towboat, says:

"And we had her down the middle of the river, a little to the right of the center of the Suspension bridge, and headed down for the center of the Chesapeake & Ohio bridge. As we were going under the Suspension bridge, the pilot on the Longfellow hollered down to me that he could not see, and motioned that the chimneys—that the smoke was blowing in his face; and a little while after that the boat took a very heavy sheer towards the Kentucky shore, and I hollered back to him that the boat was heading down inside of the pier. * * * I hollered back, he had better stop her and back her,—that I thought he would hit the pier; and he hollered back that he wanted to go down inside of that pier, and not to stop her. So I kept on, and said, 'All right,' and kept on."

And then he says again:

"A. Yes, sir; and then the boat after that took a swing to the left, and I hollered down that he was headed towards the Kentucky side of the pier, and I reached over to stop my boat; and the pilot hollered down not to stop her, and the captain repeated what he said, and told me not to stop her, and I said, 'All right,' and let her go, and never stopped her."

So to my mind it is apparent, as this testimony shows, that they were in a state of confusion. There was no cool-headed judg-

ment. There was no united action, or effort to do something practical to prevent her from running upon the pier. Knowing the dangerous condition of the passage, knowing that the smoke was likely to obscure the view as it generally does, the prevailing winds being from the southwest, if the captain and pilot had been alive to the danger, as it was their business to be, and had made the necessary arrangements with the captain of the towboat to have efficient co-operation and aid from him, and if they had been on the lookout for the smoke interfering with navigation, and all had united in some practical effort, the boat could have been stopped and backed, and, if necessary, could have been turned to the shore and moored until some other arrangement could have been made which would have insured a safe passage. So that I feel constrained to say that the disaster was due to the negligence of the captain and pilots in not taking the necessary precautions to insure the safe passage of the bridge.

In the next place, was this negligence without the privity and knowledge of the libelant? I think so. The libelant had furnished the boat with a licensed and experienced master, with licensed and experienced pilots, and had taken the precaution to hold her over until the morning of the 8th to avoid the fog; had furnished the master a tug, to aid and assist him in the passage of the bridges; and had done, it seems to me, all that was reasonably necessary to promote the safety of the voyage,—and is not responsible, therefore, for the negligence of the officers and crew. If libelant furnished experienced officers, duly licensed, and took, as it seems to me it did, all the precautions which were necessary to send her forth in safety, it was not responsible for the matters intrusted solely to the masters and pilots in the course of navigation. I find that this disaster was due to the carelessness of the officers—the master and pilots—in navigation, and that the libelant had no privity or knowledge thereof, within the meaning of the statute, so as to deprive it of the right to have its liability limited as provided by the statute, unless made liable under the provisions of section 4487, Rev. St. This section provides:

"On any steamers navigating rivers only, when, from darkness, fog, or other cause, the pilot or watch shall be of opinion that the navigation is unsafe, or, from accident to or derangement of the machinery of the boat, the chief engineer shall be of opinion that the further navigation of the vessel is unsafe, the vessel shall be brought to anchor, or moored as soon as it can prudently be done: provided, that if the person in command shall, after being so admonished by either of such officers, elect to pursue such voyage, he may do the same; but, in such case both he and the owners of such steamer shall be answerable for all damages which shall arise to the person of any passenger or his baggage, from such causes in so pursuing the voyage, and no degree of care or diligence shall, in such case, be held to justify or excuse the person in command or the owners."

Now, it is claimed in this case that the pilot called the attention of the master to the danger of continuing the voyage while the view was obstructed by the smoke, but that the master disregarded the protest, and continued the voyage, to the destruction of the boat. This claim is based upon the testimony of the Woods and Miss Dal-

rymple. Their testimony is contradicted by the pilot and the master, and is inconsistent with the testimony of the disinterested witnesses who had equal means of knowledge. Of all the witnesses who have testified, these are the only witnesses who say that the pilot complained that the smoke obscured his view, and requested the captain to stop the boat.. Capt. McKay, a man of experience in navigation, who was in the pilot house at the same time, and whose attention certainly would have been attracted by a statement of that kind, did not testify to it. But, if the testimony was not contradicted,—if it stood alone, uncontradicted,—it could hardly be said that the hasty exchange of opinions between the pilot and master as to what was best to be done in the emergency which confronted them could be regarded as an opinion on the part of the pilot that the vessel should be moored, and an election on the part of the master to proceed, within the meaning of the statute. When you look at the circumstances, assuming that there was such communication between the master and pilot as testified to by the Woods and Miss Dalrymple,—assuming that to be true,—what was meant? In the excitement of the occasion, panic-stricken as they evidently were, was it anything more than an exchange of opinion as to what was best to be done? Was it a deliberate statement on the part of the pilot that it would be unsafe to continue the voyage, and on the part of the captain an election to continue the voyage; or was it the hasty suggestion that passes from one to another on such an occasion, one saying, "Stop her;" another, "Back her;" another, "Point her to the Kentucky shore;" and others making other suggestions as to what was best to be done? But the admonition of the pilot came too late. If any such communication took place between the master and the pilot, it was immediately preceding the collision, when the election of the captain could in no way affect the result which followed. I think the communication which passed between them was at a time when it was no longer possible to avoid the collision. I think an examination of the evidence would be convincing to any one that the point had been reached when it was impossible to avoid the danger of the collision which followed. I am of the opinion, therefore, that the libelant is entitled to have its liability limited to the value of the vessel and her pending freight, and it will be so decreed.